**William M. FINKE, Plaintiff-Appellant,**

v.

**UNITED FILM SERVICE, a Corporation, Defendant-Respondent.**

No. 49115.

Supreme Court of Missouri,

Division No. 1.

Dec. 11, 1962.

Motion for Rehearing and to Transfer to Court En Banc Denied Jan. 14, 1963.

Arthur C. Popham, Kansas City, Popham, Thompson, Popham, Trusty & Conway, Scarritt Bldg., Kansas City, of counsel, for appellant.

Hilary A. Bush, Paul E. Vardeman, Jr., Johnson, Lucas, Bush & Vardeman, Kansas City, for respondent.

DALTON, Presiding Judge.

This is an action for $31,000 for personal injuries and property damage alleged to have been sustained by plaintiff in an intersectional collision in Kansas City, Missouri, between two motor vehicles (station wagons), one operated by the plaintiff and

the other by defendant's employee. Verdict and judgment were for defendant and plaintiff has appealed.

Appellant assigns error on the admission in evidence of Sec. 3122.1 of the Revised Ordinances of Kansas City, Missouri, an ordinance dealing with the right of motor vehicles to right-of-way at street intersections. This ordinance was pleaded in the plaintiff's petition in support of an assignment of primary negligence, and the petition had not been amended when the ordinance was admitted in evidence at defendant's request. The cause was subsequently submitted to the jury solely on humanitarian negligence in failing to sufficiently slacken the speed of defendant's westbound vehicle to permit plaintiff's northbound vehicle to escape through the intersection in safety. The ordinance was offered near the close of defendant's evidence and, before it was actually *received* into evidence, the plaintiff objected and announced that he expected to and would submit his case to the jury on humanitarian negligence alone. Appellant further contends that prejudicial and reversible error was committed in permitting defendant's counsel to make certain argument, which appellant insists emphasized and reviewed plaintiff's antecedent or prior primary negligence. In reply, the respondent contends that the argument, fully supported by the evidence, was proper and did not constitute prejudicial error in view of the terms of plaintiff's principal instruction submitting humanitarian negligence. This instruction contained the humanitarian submission and further authorized a recovery by plaintiff, even if the jury believed the plaintiff " * * * was himself negligent, and thereby directly contributed to said collision, *but did not solely cause same,* if you so find." (Italics ours.) Respondent's theory is that "sole cause" was properly argued as a defense.

From a careful review and consideration of the entire record, including the manner in which the cause was pleaded, stated, tried and submitted, we have reached the conclusion that no prejudicial error appears; however, a review of the entire record is necessary to support the conclusion reached.

The nature and extent of plaintiff's injuries and the amount of property damage sustained are not in issue on this appeal. There is no contention that a case was not made for the jury on the ground submitted, nor is there any complaint with reference to the giving, or refusal of instructions. Other matters require attention.

It is admitted that on October 26, 1959, between 10:30 a. m. and noon, a collision occurred at the intersection of 37th Street and Bales Avenue in Kansas City, Missouri, between plaintiff's northbound motor vehicle operated by plaintiff and a westbound motor vehicle owned by the defendant and operated by its agent Jackson, who was acting in the course of his employment. Bales Avenue extends north and south, while 37th Street extends east and west. The streets at the intersection are between thirty-five and thirty-seven feet in width; both are paved with blacktop; there is no traffic light, stop sign or other traffic control at the intersection except that ten or twelve feet *south* of the intersection on Bales Avenue there is a sign which reads: "Slow, 10 Miles Per Hour."

As indicated, the plaintiff in his petition pleaded specific primary negligence and also humanitarian negligence. The assignments of primary negligence included a charge based on the violation of the mentioned right-of-way ordinance of Kansas City, No. 3122.1, subsequently introduced in evidence by defendant as follows: "The driver of a vehicle approaching an intersection shall yield the right-of-way to a vehicle which has entered the intersection. When two vehicles enter an intersection at the same time the driver of the vehicle on the left shall yield to the driver on the right."

Other assignments of primary negligence were as follows: "That defendant operated its said motor vehicle at dangerous speed under the conditions herein set forth and negligently failed to keep same under rea-

sonable control, negligently failed to keep a lookout laterally and ahead * * * that his [plaintiff's] motor vehicle entered said intersection before the vehicle of defendant reached the same, and that defendant negligently failed to yield plaintiff the right-of-way."

The assignment of humanitarian negligence was based upon the alleged failure to slow defendant's vehicle or swerve it and prevent the collision after plaintiff and his vehicle were in imminent peril.

Defendant's answer affirmatively pleaded the contributory negligence of plaintiff "in that plaintiff disregarded a ten mile per hour speed limit across said intersection and was proceeding across said intersection at a speed greatly in excess of ten miles per hour; * * * failed to yield the right-of-way to the motor vehicle owned by defendant", which vehicle reached the intersection first or at approximately the same time as plaintiff's vehicle, and that, in the exercise of the highest degree of care, plaintiff could have seen defendant's vehicle, known of the danger of a collision and have avoided the collision by stopping, slackening speed, turning it aside or sounding a warning of his presence and intention to proceed across the intersection without reducing his speed to ten miles per hour.

In reviewing a case upon appeal we must necessarily review it upon the theory upon which it was tried and submitted in the trial court. Having reviewed the pleadings, we must now consider the opening statements of the parties. Plaintiff's counsel, in his opening statement, stated that the plaintiff lived out on Bales Avenue not far from where the collision happened; that he was entirely familiar with the intersection and knew that, as he went north on Bales and before he got to 37th, he would encounter a sign there that said ten miles, " 'Slow, 10 miles' ". Counsel further states: "There were no stop signs against traffic on either street. There were no lights there. There were no control signals. We do not speak of it as a controlled intersection, it is what

we speak of as an open intersection. * * * There was nothing there to keep drivers from seeing either direction and we will prove that. Anything there was so low it didn't amount to anything at all to the driver who was looking where he was going."

On the issue of right-of-way, plaintiff's counsel stated: "The evidence will be that when Mr. Finke looked on 37th before crossing that intersection, he looked one way and saw nothing, he looked the other way and he saw this vehicle of the defendant company, and his best judgment is that it was a hundred feet from that intersection when he was ready to go into it. * * * The evidence will show that man [Jackson] did just the opposite from that, and this evidence will be virtually undisputed. The evidence will be that he did slow somewhat, but when he got to about 30 feet from this intersection he wasn't looking where he was going but was looking the other way and increased his speed and caught this man before he could get over the intersection." Counsel also referred to the case as "an almost escaping case" by saying "the evidence will show if this colored man Jackson had slowed up just a little bit there would have been no collision."

Defendant's opening statement also pointed out that the evidence would show the ten mile an hour slow sign at the intersection for traffic going north on Bales; and that "on the corner of 37th and Bales, on the southeast corner, there is a house with a hedge and some large trees in the yard, and there is somewhat of an obstruction to view at that point, so the city ordinance, under the ordinance this 10 mile per hour stop sign was erected for traffic moving the way the plaintiff was going." He further pointed out that not only did plaintiff have a "slow sign" at the intersection, but that there was the city ordinance which required a vehicle in the intersection first to have the right-of-way, and when vehicles arrived at about the same time "the one approaching from the right has the right of way to proceed through the intersection." Counsel said defendant's evidence would show that

plaintiff approached the intersection and "didn't continue slowing up and yield but instead he speeded up and tried to beat his way across the intersection," and that plaintiff's station wagon "hit the left side of the station wagon * * * operated by United Film." Counsel further pointed out that their evidence would show that their station wagon was approaching the intersection from plaintiff's right and the ordinance, under the evidence that would be shown, gave "the one approaching from the right * * * the right-of-way to proceed on through the intersection. I am sure most of you are familiar with that."

Plaintiff's evidence: Plaintiff's personal testimony tended to show that he was driving a 1958 Chevrolet station wagon northwardly on Bales Avenue approaching the intersection with 37th Street. The streets were almost level, although going north on Bales one proceeded up a very slight incline. Plaintiff was well acquainted with the intersection, since he lived only a short distance south of the intersection and had resided there for many years (since 1925). He had no eye trouble, but wore glasses and was wearing them at the time. His vehicle was in good shape, the windshield was clear, the brakes were in good condition and so was the horn.

As the plaintiff proceeded north on Bales Avenue his car was moving east of the center line of Bales and about two feet out from the east curb line. His speed was 20 to 25 miles per hour. He observed the slow sign located at the intersection with 37th Street. He was familiar with the sign, which was 10 to 12 feet back from the 37th Street, and he had seen it approximately fourteen times per week for many, many years. There was a hedge on his right but no trees, and the low hedge, with which he was familiar, did not interfere with his vision to the right. When plaintiff reached the slow sign he had slowed his car to approximately 10 to 11 miles per hour. At that particular time he observed defendant's Chrysler station wagon approaching from his right some 75 to 90 feet away.

At one time plaintiff said "about 75 feet"; at another, "90 feet." At another time he said, "I still say between 75 to 90 feet." Plaintiff's foot was not on the brake but on the accelerator.

Plainitff knew there were no slow signs on 37th Street. He thought that defendant's station wagon was approaching at 20 to 25 miles per hour. "He wasn't going fast." However, plaintiff proceeded on across the intersection with no change of speed so that at the time of the collision his station wagon was moving not in excess of ten to twelve miles per hour. He says that when he put his foot on the accelerator it didn't move the car quick enough to get out of the way of defendant's station wagon which was approaching from the east, and out only three or four feet from the north curb line of 37th Street; and that the front end of defendant's Chrysler station wagon came in contact with plaintiff's vehicle immediately behind the right front fender. At the moment of collision, the front of plaintiff's vehicle had reached a point even with the north curb line of 37th Street. Plaintiff testified: "It looked like the man was slowing up as I entered the intersection and then as he got about 30 or 35 feet from the intersection. I saw the man was looking north in the middle of the block there, about, and then all at once it picked up speed."

Plaintiff further testified that, at the time of the collision, he had traveled from the slow sign 10 feet up to the intersection and the front end of his car had reached the north curb line of 37th Street. He had traveled this distance at 10–11 miles per hour, while the Chrysler moved the distance from 75 to 90 feet to the intersection. After plaintiff saw the Chrysler approaching he kept watching it. "I couldn't help watching it I was going through, starting through the intersection." The Chrysler had approached some 40 feet when plaintiff observed its driver looking north. Plaintiff was then halfway across the intersection. Plaintiff's foot was then on the accelerator. "I had just put my foot back on the ac-

celerator." At no time did plaintiff sound his horn, apply his brakes or swerve. Neither did the Chrysler swerve. Plaintiff just tried to get out of the way of the approaching Chrysler. At one place plaintiff said that defendant's driver looked forward at the instant of the impact. At another time he said it was hard for him to recollect whether he ever saw the driver of the Chrysler look forward toward plaintiff's car after plaintiff saw that the driver was looking to the north. Plaintiff also said that "he was trying to get out of the way. I thought he [Jackson] didn't see me."

Plaintiff was unconscious after the collision and was removed to Menorah Hospital where he subsequently regained consciousness.

Defendant's evidence: The testimony of William Jackson, Jr., tended to show that it was part of his regular job to drive defendant's station wagon when the regular driver was off duty. On the date in question he had been making deliveries for defendant and was returning to the company's plant before noon. As he drove west on 37th Street and approached the intersection with Bales Avenue he was traveling at 20 to 25 miles per hour. He knew of the "slow sign" on Bales Avenue and knew there were no traffic controls at the intersection for 37th Street traffic. As he more closely approached the intersection he slowed to 15 to 20 miles per hour since there was a hedge and a tree to the left that limited his ability to see to his left down Bales Avenue to the south; however, he looked in that direction for traffic. He testified: "I looked to my left, I couldn't see him. I looked to my right, I didn't see no traffic and I looked back to my left and there was a car right on me. * * * I was right in the intersection", and so was the "Chevy." The witness attempted to swerve the Chrysler to the right to escape plaintiff's car, but had no time to do anything else, and the collision occurred.

While the witness first said he had no judgment as to the speed of the "Chevy" he later testified: "I would judge about 25 to 30 miles an hour." The front end of the "Chevy" hit the front door of the Chrysler, that is, the right front tire and wheel of the "Chevy" hit the left front door of the Chrysler, then the back ends of the two vehicles came around together, and the Chrysler went kind of angling off to the right while the "Chevy" went across 37th Street and into a lady's yard to the west. Defendant's Exhibit No. 3 shows the damage to the left front door and rear portion of the left front fender of defendant's Chrysler. No damage to the headlights and front bumper appears. The witness examined defendant's Exhibit 3 and pointed out to the jury where the "right tire and front wheel" of the "Chevy" hit the Chrysler. When an ambulance came, they put plaintiff in the ambulance and took him away. Witness then called the police station.

On cross-examination the testimony of the witness tended to show that he knew he might have difficulty seeing cars approaching from the south on Bales Avenue; however, when he looked forward "no car was approaching." His eyesight was good, the weather was kind of cloudy and the streets were damp. It was broad daylight and he had slowed before he went into the intersection. When he entered the intersection his speed was "ten or fifteen, maybe." He did not see the "Chevy" until the Chrysler was in the intersection and it was then right on him. He did not even get his foot on the brake before the accident happened. It had already happened. The "Chevy" had hit him. He knew it was an open, public intersection and that people used it. He said: "Coming down the little slope, yes, you can not see." The hedge was there and the tree was there and, after he got past these, the "Chevy" was on him and hit him. The Chrysler was in the intersection when the "Chevy" hit him. He had put on his brakes as he approached the intersection to decrease his speed before he entered the intersection. Again he said: "I looked to my left, then I looked to my

right before I got into the intersection. * * * I looked both ways and then I looked to my left and my right, and I looked back to my left and he was on me, yes." The "Chevy" was then a foot or so away. He also said: "I looked to my right, and when I looked back around, it was there. * * * I was a little bit on the other side of the intersection when it happened." He later admitted that he had previously correctly testified that the collision happened in the center of the intersection, that is, in the center of each of the two streets, 37th and Bales, and that he had also said: "Well, before I got in the intersection I didn't see it, but after I got in the intersection, I was halfway in, about twenty-four or twenty-five feet. * * * I didn't see it at all from that point." Again he said: "When I was in the intersection I saw it, he was then fixing to hit me." The Chrysler had a good set of brakes and they had slowed up the car prior to entering the intersection in accordance with the witness' prior testimony.

Defendant also offered in evidence excerpts from the Menorah Hospital records, in part, to the effect that the patient (plaintiff) "stated that the last thing he remembered was that he was driving his car and the next that he was being put in an ambulance. He has no memory of what happened."

Near the close of defendant's evidence, defendant's counsel, out of hearing of the jury, advised the court that he desired to offer and read to the jury, on behalf of the defendant, Ordinance No. 3122.1 of the City of Kansas City, Missouri, "an ordinance that was pleaded in plaintiff's petition but was not offered * * *."

Thereupon, the record shows that counsel for plaintiff spoke as follows: "MR. POPHAM: I object to it for the reason that although we pleaded it in our petition we did not introduce it and we did not introduce it because we have elected in this case to submit solely on the humanitarian doctrine, and with that election in the record

this becomes antecedent or primary negligence, which hasn't got any more to do with the submission Your Honor will make in this case than green cheese in the moon. It would merely complicate the issues in this case. * * * *Since we have elected and will elect to submit solely on the failure of this man to slow his vehicle and let us get by and not have this collision, it could not possibly have any legal propriety in this evidence.*" (Italics ours.)

Prior to that statement by plaintiff's counsel, the cause had been tried by *both parties* under the pleadings as they stood when the trial opened and, except for counsel's statement, as hereinbefore set out, *no election was made of record and there was no express dismissal of the assignments of primary negligence as contained in plaintiff's petition.*

Defendant's counsel thereupon insisted that the plaintiff by his mere statements had made no binding election to submit on the humanitarian doctrine ("I don't know that they have made any election * * * *") and stated that the ordinance was being offered solely because *it was admissible under primary negligence,* since the ordinance dealt with "right-of-way at an intersection." While the court stated it (the court) felt that plaintiff's counsel was bound by his mere statement without any further actual election of record and without any actual dismissal of the assignments of primary negligence as contained in the petition, nevertheless, the court permitted the ordinance to be read into the record, since it was in effect at the date of the collision. Plaintiff's counsel thereupon stated: "If he reads it I am going to give an instruction withdrawing it because it will have no part in this case." The mentioned ordinance has *hereinbefore* been set out in full, as offered and read in evidence. Also Instruction No. 4, *hereinafter* set out, was given at plaintiff's request.

Defendant further offered in evidence numerous photographs taken of the respective vehicles immediately after the collision by

a news photographer. It is impossible to review this important evidence in an opinion or to state the conclusions that may be drawn from it.

At the close of all the evidence, the cause was submitted to the jury by plaintiff's Instruction No. 1, which submitted humanitarian negligence in failing to slacken speed. The instruction was, in part, as follows: "* * * that it is duly shown and established of record that at the time of the collision referred to in evidence the driver of the westbound motor vehicle was in the employ of defendant company and acting in the scope of his duties, and if you believe from the evidence that plaintiff and his northbound car were in imminent peril and danger of being injured by collision of said cars, and if you find that said driver Jackson knew or by the exercise of the highest degree of care would have timely known of the above submitted imminent peril and danger of plaintiff in time thereafter by the use of the highest degree of care to have sufficiently slowed the speed of said westbound vehicle with the use of the means at hand and with safety to said vehicle of defendant and its driver, and if you find that said driver Jackson failed to use such care so to do, and if you find that as a direct result of his above-submitted failure, said vehicles collided at said intersection and that plaintiff Mr. Finke was thereby injured and his car damaged, if you so find, *then your verdict must be for plaintiff Mr. Finke, and this is the law and is true, even if you should believe that Mr. Finke was himself negligent, and thereby directly contributed to said collision, but did not solely cause same, if you so find.*" (Italics ours.)

Thereafter, plaintiff requested and the court gave plaintiff's Instruction No. 4 as follows: "You are further instructed that in opening statements and during the trial references have been made to some ordinance and to right of way or to antecedent or prior negligence or alleged acts of negligence before plaintiff was in imminent peril, if you so find he was, as submitted in instruction one, and in this connection, this case is submitted under what is known as the humanitarian doctrine, and under the same, if you find all the issues submitted in said instruction one, in favor of plaintiff Mr. Finke, then contributory negligence, if there was any, on the part of Mr. Finke, though directly contributing to the collision, would not be a legal defense available to defendant, and in deciding the issue of liability on which the case is submitted in instruction one, you are not to base a verdict on any antecedent or prior negligence, if any, taking place before the submitted imminent peril, if any, of plaintiff came about."

The court also gave Defendant's Instruction 6 to the effect that "plaintiff is required to prove by the greater weight of the credible evidence that defendant was negligent, as defined in other instructions" and if plaintiff failed to do so their verdict should be for defendant.

In the course of argument by defendant's counsel to the jury, after a most bitter attack upon the credibility, weight and value of plaintiff's personal testimony in the case, counsel proceeded as follows: "The Court tells you in its instructions here to consider the physical facts. By that he means the way these cars came together. And you men nearly all drive, most of you are very experienced drivers, and you know what the situation was. The burden was on Mr. Finke out there, he had the 10-mile sign. He had the duty to yield the right-of-way.

"MR. POPHAM: Just a minute, Your Honor, I object to that because it is entirely outside the instructions of the Court. Your Honor has told them in instructions that the sole question here is whether or not he should have slowed and let this man by and now he is arguing prior and antecedent matters that Your Honor tells him he can't argue and he is absolutely flaunting the instructions of this Court and it is improper.

"THE COURT: You will follow the instructions as given to you by the Court.

"MR. VARDEMAN: I don't mean to argue anything improper, men.

"Mr. Popham has failed to call your attention to one thing in this Instruction No. 1. 'This is the law and it is true, even if you should believe that Mr. Finke was himself negligent and thereby directly contributed to said collision but did not solely cause the same.'

"You have got to decide who was at fault. That is your duty. If you believe Mr. Finke caused the accident as the Court tells you—he uses that word 'did not solely cause the same,' then he can't recover at all, and that it why I say to you consider what the facts were, the physical facts as shown by that intersection and the way these cars came together * * *.

"Mr. Popham referred to our driver, Mr. Jackson, a young colored boy we brought in here. * * * He is out of this thing now completely. I think he told you a straight-forward story and a reasonable story. Traveling along as he did, having the 10-mile protection that he did, he had the right to go across that intersection, and, now, here's a man who runs into him, and I say runs into him because I think that is what the facts are, and comes up now and changes his testimony and moves the cars all around and then says, 'Well, I think I am entitled to recover because under this thin humanitarian submission, if the jury believes all these things, then I might get by.'

"MR. POPHAM: If Your Honor please, I must object to him referring to Your Honor's instructions as thin submission of something. It is improper and the lawyer knows it and he is again flaunting the instructions of this Court. I object to that expression about Your Honor's thin instructions, because Your Honor hasn't given any thin instructions that I know anything about. I don't think counsel ought to do that.

"THE COURT: I will sustain the objection.

"MR. VARDEMAN: Well, maybe I shouldn't have said the instructions were thin, but the evidence was certainly thin.

I just ask you, members of the jury, to use your own common sense in this matter."

Was prejudicial error committed in the admission of the Kansas City Right-of-Way Ordinance No. 3122.1, which was offered and received in evidence at defendant's request? This ordinance was pleaded in plaintiff's petition. From the opening statements of the parties, it is apparent that both parties relied upon it—plaintiff to support an assignment of primary negligence and defendant to support one of its defenses. Further, both parties tried the case on the pleadings as they stood at the opening of the case, and it was not until almost at the close of defendant's evidence that this ordinance, pleaded by plaintiff, was offered by defendant.

Plaintiff's objection to the admission was based upon his statement that, "We have elected in this case to submit solely on the humanitarian doctrine." Subsequently counsel for plaintiff said, "since we have elected and *will elect* to submit solely on the failure of his man to slow his vehicle and let us get by and not have this collision, it could not possibly have any legal propriety in this evidence." (Italics ours.) Even after opposing counsel said "that is a matter we will have to fight out at some later date" as to whether or not plaintiff had made a humanitarian case, and later defendant's counsel stated, "Your Honor, I don't know that they have made any election * * *", still plaintiff's counsel made no attempt to amend his petition. He asked no dismissal of any of the assignments of primary negligence set out in his petition. While plaintiff's counsel insisted "I am bound because I have taken that stand here" and the court said, "I think with that understanding he is bound by it", nevertheless the court did not fully accept counsel's statement and promise to subsequently elect and submit his case to the jury on humanitarian negligence alone, at least not to the extent of preventing defendant's counsel from reading the offered ordinance into evidence.

We must further keep in mind that this ordinance governing the rules of the road with reference to right-of-way at intersecting highways had been fully discussed by the parties in their opening statements and if the jurors were not already fully aware of the rules of the road with reference to right-of-way at intersections they certainly didn't obtain any new information from hearing the ordinance read to them.

Motor vehicles have been more or less in common usage for more than fifty years, and in this day of their almost universal use and operation it could hardly be assumed that the members of a panel of jurors from Kansas City would not be fully aware of the mentioned provisions of the city ordinance or of the state laws substantially to the same effect. See Sec. 304.021 (Laws 1953, p. 587) and see Sec. 304.020 RSMo 1949, V.A.M.S. and prior revisions back to the Rules of the Road as set up in Laws 1917, pp. 403, 414, Sec. 10(4).

While trial courts may act upon statements of counsel in the trial of a cause, we find no cases to the effect that the court is required to act thereon, absent affirmative action taken by counsel at the particular time, as counsel could have taken in this case by affirmatively dismissing the assignments of primary negligence and settling the matter definitely, and before the close of all the evidence in the cause. In the case of Davis v. Chicago & E. I. Ry. Co., 338 Mo. 1248, 94 S.W.2d 370, 373(9), the court said: "Plaintiff's counsel stated during the examination of witnesses that: 'We do not plead interstate [commerce], anyhow.' 'Interstate commerce has nothing to do with this case other than if the engine was used in interstate traffic, and that is all I want to know.'" In that situation this court said: "We deem what plaintiff stated *orally* not controlling. Without the petition being *amended,* what defendant did should control." (Italics ours.)

Assuming without deciding that counsel's mere statement to the trial judge in the course of the trial was binding upon the plaintiff, if the trial judge accepted and acted upon it, nevertheless, in view of the fact that plaintiff did not amend his pleadings in any manner, nor offer to do so, he left the court free to accept his statement or disregard it, as he deemed proper, but in this case the court did not act upon it to the extent of excluding the ordinance in question.

■ On this appeal appellant insists that the reading of the ordinance to the jury *injected plaintiff's alleged contributory negligence and antecedent negligence* into a humanitarian case; however, we think it *clear from the record* that, at the time the ordinance was offered and subsequently read to the jury, the case was not solely a humanitarian case, and the action of the trial court is a clear demonstration of the fact that the court, at the particular time, did not consider the case solely as a humanitarian case. The court's ruling recognized that the assignments of primary negligence were still before the court and the jury; and that plaintiff's contributory negligence was a proper defense under the pleadings as they then existed. We must and do hold that the court did not commit error in permitting the ordinance to be read in evidence to the jury. In any event, the error, if any, was not prejudicially erroneous under the facts of this case. In view of the record as presented here, it is unnecessary to review the numerous cases cited by appellant supporting the well-recognized rule that it is error to inject evidence of contributory negligence and antecedent negligence into a humanitarian case.

Subsequent to the close of all the evidence, it is true that the plaintiff did, in fact, elect to and did submit his case to the jury under the humanitarian doctrine alone, as hereinbefore set out in plaintiff's Instruction No. 1. Such procedure is not at all unusual; however, plaintiff's instruction submitting the case was most unusual. The instruction advised the jury that plaintiff's contributory negligence, if any, was no defense in this humanitarian submission, nevertheless, the instruction in effect told the

jury that, if the collision and injuries resulted solely from the action and conduct of the plaintiff alone, the plaintiff could not recover. Plaintiff-appellant's own Instruction 1, in fact, gave the jury "a roving commission", without help or guidance, to determine *a fact issue.*

Plaintiff's counsel had argued to the jury in the closing portions of his opening argument somewhat as follows: *"They* [defendant] *have no defense on the facts.* And I come back to where I started when I made my opening statement, that the sole issue in this case is whether or not the man looked where he was going and if he had used the highest degree of care and seen this car and just made one friendly little touch of the brake and let him [plaintiff] go on uncrippled, enjoying life, and his failure to do it has resulted in this * * *." (Italics ours.)

However, we think it is clear from plaintiff's own Instruction 1 that plaintiff had, in fact, submitted *two* questions to the jury; one on defendant's humanitarian negligence and the other on plaintiff's conduct as the "sole cause" of the collision and that under plaintiff's own instruction and the facts in evidence, the jury could find that plaintiff's action and conduct was the sole cause of the collision and injury.

■ The next question presented is whether or not the argument complained of, wherein the defendant's counsel reviewed the physical facts and argued "sole cause", was prejudicially erroneous under the facts and instructions shown by the record in this case, and whether such argument in any of the respects complained of by appellant was prejudicially and reversibly erroneous.

After the court gave plaintiff's Instruction No. 1 the defendant's counsel in argument began to make full use of the exception noted at the close of plaintiff's instruction. He argued that plaintiff's action, as shown by the evidence, was the "sole cause" of the collision and damage. Counsel fur-

ther reviewed plaintiff's testimony that Mr. Popham had *not* sent him to Dr. Callaway to determine his physical condition; that he picked the name out of the telephone book; and that he found the name by looking under physicians, and selected one under ear specialists. Counsel then pointed out how Mr. Popham had interfered and said to counsel: "Paul, if you want to save time on that, there is no secret about it, I recommended Dr. Callaway to him because I wanted a test of his ears. Let's don't waste time over trivialties." Counsel further reviewed conflicts between plaintiff's prior deposition and his testimony before the jury and advised them, *without objection,* as follows: *"It is because they were trying their level best to squeak by and get an instruction on imminent peril and they knew to find Finke in a position of imminent peril they had to get the Chrysler further back and they had to slow down Finke's speed."* Subsequently counsel proceeded as follows: "Why all these changes? Why are they changing their story now? Where was his car at the point of impact? There is a good question. Mr. Finke says, 'The front of my car was at the north curb' * * *. If the Chrysler had hit the Chevrolet as Mr. Finke says, don't you think there would be some damage on the front? Don't you think that the headlight would have been broken, at least?" Counsel then pointed out what the witness said was "the imprint of Finke's wheel" on the left side of defendant's station wagon. Counsel then reviewed the hospital record and added: "I don't know when he decided that he was in the intersection first or when he decided that he was hit by our car. I leave that up to you * * *."

All of these arguments were made without objection. Thereafter the matters hereinbefore quoted and relied upon for the reversal of this case took place. The objections were made after defendant's counsel had argued that "the court tells you in its instruction here *to consider the physical facts.* By that he means the way these cars came together." (Italics ours.)

We think the argument subsequently made, and now relied upon by appellant, was clearly invited by counsel for the plaintiff in his own argument and by plaintiff's own instruction to the jury. It is true that counsel for defendant sought to argue plaintiff's testimony and purpose in changing his testimony and so referred to "this thin humanitarian submission," but, after objection was made and *sustained,* plaintiff's counsel asked for no further relief. The defendant's counsel then proceeded to tell the jury, "Well, maybe I shouldn't have said the instructions were thin, but the evidence was certainly thin. I just ask you, members of the jury, to use your own common sense in this matter." It appears that plaintiff was satisfied with the court's action at the time.

In support of appellant's assignment of error with reference to this particular portion of defendant's argument to the jury, numerous cases are cited which hold it to be prejudicial error to argue contributory negligence and plaintiff's antecedent negligence in a humanitarian negligence case. We have a very different situation here from the usual case in view of plaintiff's Instruction No. 1. None of the cited cases are applicable under the particular facts of this case which opened up the issue of "sole cause" on a factual basis.

Most of the cases relied upon by appellant involve appeals where *instructions* offered by defendant permitted the consideration of contributory and antecedent negligence in a humanitarian case. See Burks v. Wilson, Mo.Sup., 356 S.W.2d 121, 127; Catanzaro v. McKay, Mo.Sup., 277 S.W.2d 566, 570; Sheerin v. St. Louis Public Service Co., Mo.Sup., 300 S.W.2d 483, 489.

Apppellant also complains bitterly of the court's admonition to the jury to "follow the instruction given you by the Court." Appellant says that this ruling "was the tacit approval and sufferance" by the court of defendant's position; however, the argument was invited by plaintiff's Instruction No. 1, and plaintiff's method of trying and submitting his case.

It is our conclusion from a full consideration of the entire record that no prejudicial or reversible error appears.

The judgment is affirmed.

All concur.